By the Court, Cowen,
J. This case has been argued main Jy on the general words at the conclusion of the fourth section of the village charter. (Sess. Laws of '28, p. 447, 8.) So far as the arguments go on these, they need not be considered; for I am of opinion that the offence prohibited is within the more particular words. Among other things, the trustees are authorized by that section to make by-laws relative to slaughter houses and nuisances generally. The by-law in question provides that it shall not be lawful for any person to keep or maintain any ball-alley, or apparatus, alley, machine, building or enclosure, constructed or used for the purpose of playing thereon or therewith at the game called or known by the name of nine-pins or ten-pins, for gain, hire, reward or emolument of any kind, or in any manner whatsoever. Establishments of this kind in populous communities are, at best, and even when used without hire, very noisy, and have a tendency to collect idle people together and detain them from their business. When built and kept on foot for gain, the owner is interested to invite and procure as full an attendance as possible, day after day; and for this purpose temptations beyond mere amuse *124 nient are often resorted to, such as drinking and gaming. So far as I have been able to discover, erections of every kind adapted to sports or amusements, having no useful end, and notoriously fitted up and continued with the view to make a profit for the owner, are considered in the books as nuisances. Not that the law discountenances innocent relaxation; but because it has become matter of general observation that, when gainful establishments are allowed for their promotion, such establishments are usually perverted into nurseries of vice •and crime. Common stages for rope-dancers have been adjudged nuisances at the common law ; “ not only,” says Hawkins, “because they are great temptations to idleness, but also Because they are apt to draw together great numbers of disorderly persons, which cannot but be very inconvenient to the neighborhood.” (1 Hawk. P. C. by Curwood, ch. 32, § 6.) In the next section, he distinguishes between places kept for such useless sports, and play-houses, which were originally instituted for the laudable design of recommending virtue to the imitation of the people and exposing vice and folly. These, he says, are not nuisances in their own nature; but may only become such by accident; whereas the others cannot but be nuisances. I mention common stages for rope-dancing, because bowling-alleys were long since held to stand on the same footing. (Jacob Hall’s case, 1 Mod. 76.) Hall, a rope-dancer, had erected a stage or was about erecting one at Charingcross, Avhich the court of king’s bench pronounced to be a nuisance, Hale, Ch. J. mentioned as a precedent “ that in the eighth year of Charles the First, Noy came into court and prayed a Avrit to prohibit a bowling-alley erected near St Dunstan’s church, and had it.” In the report of Hall’s case in 2 Keb. (p. 846,) Ch. J. Hale is represented as saying that “ Noy prayed a Avrit to remove a bowling-alley; and had it Avithout any presentment at all.” Thus Ave see Hawkins is sustained by the highest authority' in saying that such places cannot but be nuisances. The tendency of the alley being Avell knoAvn, it was adjudged to be a nuisance of itself; and a Avrit accordingly issued to rémove it Avithout any trial. Noav this is not *125 because rope-dancing, or playing at nine-pins or any other game with bowls is a mischief; nor that being a spectator at a rope-dance is censurable in the least. Such acts are not nuisances. In themselves they are entirely innocent. The nuisance consists in the common and gainful establishment for the purpose of sports, having the aptitude and tendency of which Hawkins speaks; not that this always produces the consequences of which he complains, but because there is imminent danger of its doing so. A deposite of gun-powder—a useful article—among a block of houses, might be very harmless; yet it is a public nuisance, from the danger of explosion. (Anon. 12 Mod. 342.) The case of The People v. Sergeant (8 Cowen, 139) is relied on, which held that a room kept for the playing of billiards was not a public nuisance, though a profit was made of it. But the court disavow the intent to interfere Avith the principle laid doAvn by Hawkins. On the contrary, they refer to it with approbation, and admit that the keeping of a gaming house Avas an indictable offence at common laAV. - This Avas held expressly in Rex v. Dixon, (10 Mod. 335.) Yet the act of gaming was no more criminal by that laAV than dancing on a rope or playing at cricket. It may be someAvhat difficult to reconcile The People v. Sergeant Avith the general principle Avhich seems perfectly Avell settled; but the case claims no more than that a billiard-room appearing to be kept in a particular way forms an exception. In general, the laAV is not scrupulous about actual results. It sees that a building has been erected for at least an idle purpose, the probable consequences of Avliich will be pernicious. It does not stop, therefore, and call Avitnesses to prove that it is so in fact. When Hall, the rope-dancer, Avas brought up, Lord Hale held it enough that the stage had been or Avas about to be erected. He told him he understood it Avas a nuisance to the parish. It is true that some of the inhabitants, being present, said it occasioned broils and fightings, and drew so many rogues to the place that they lost things out of their shops every afternoon. But this information was not received as from witnesses. No one could on his oath connéct the cause with the effects; and no one appears to have *126 been sworn. All the evils complained of might have existed without the stage. Had the erection been for the purpose of some useful business or object, actual consequences would have been inquired of. But it was the simple case of one man squandering his time for money, in order to induce others to waste both their time and money.
No one is so blind as not to see that such places, on their becoming known, bring together the most profligate mixtures; brawlers, drunkards, gamblers, blacklegs, pickpockets, and other petit thieves. Lord Hale did not want witnesses of this. All he wanted was the notoriety of the fact—the testimony of experience. According to the report of Hall’s case in 2 Keb. there were mere affidavits that Hall was going on to build his booth, which was not yet done. The reporter adds that, after the court were informed of the working, they sent for Hall and the workmen by a tipstaff; “ and because he would not enter into a recognizance not to build on, they committed him, and then he ceast.” Yentris gives the same account of the matter. (1 Ventr. 169.) He says, the complaint was that the booth was erecting, and that Hall intended to shew his feats of activity to the annoyance of the complainants “by reason of the croud of idle and naughty people that would be drawn thither, and their apprentices inveigled from their shops.” The court ordered him to stop, to which he replied, with great impudence, that he had the king's warrant for it and promise to bear him harmless. After committing him, the court caused a record to be made of the nuisance, as upon their own view, and awarded a writ to the sheriff to prostrate it. All this is only following out the rule of law that a man shall be holden accountable for the probable consequences of his acts; the obvious ground on which the court proceeded a few years before in the case of the bowling-alley without even waiting for a presentment. In Rex v Moore, (3 Barn. Adolph. 184,) the defendant was convicted on the ground that he had collected a crowd in his own field for pigeon shooting, by which the neighborhood was annoyed; and he was held guilty of a nuisance. Littledale, J. said, “ No doubt it was not his [the defendant’s] object [to create *127 a nuisance.] If it be the probable consequence of his act, he is answerable as if it were his actual object. If the experience of mankind will lead any one to expect the result, he will be answerable for it.” In Rex v. Howel, (3 Keb. 465,) which was in the 27 Car. 2, the court thought an indictment for a nuisance in keeping a cock-pit valid at common law; and this again on the authority of the bowling-alley case which they mentioned and said it was pulled down as a common nuisance. In Rex v. Dixon, the indictment was simply for keeping a common gaming-house. No consequences Avere mentioned; and it did not conclude ad commune nocumentum. It was therefore insisted that it could not be good at common law. The court answered, the conclusion Avas not necessary, because the act was an offence in its OAvn nature.
In the case before us, the rules of playing in Tanner’s ball alley are stated, Avith an instance of play by persons Avho hired the alley and proceeded under the inspection and reckoning of Tanner. I have gone into a consideration of the cases, to show that a building Avhich the law considers a nuisance in its own nature, when kept in a particular Avay and for a particular purpose, is not to be tested by appearances. It cannot be modified by printed rules against the practice of gambling, and by the surveillance of the owner as if to see that they are not violated. The Iuav knows that appearances are often simulated. Vicious houses commonly make loud pretensions to such superior regularity, that, hoAvever others may behave, they Avould be thought an exception. In the case of the ball-alley mentioned by Lord Hale, the court did not send and inquire what appearances of regularity and decency might be affected by the owner. Information that it Avas a boAvling-alley satisfied them; and they issued a Avrit to abate it, Avithout Avaiting for a trial. Their oavu sagacity spoke as to the ultimate effects. If the builcjjng had been so far Avell conducted, so much the better for community. The court determined that it should not afterwards be conducted at all, on account of the consequences which Avould probably ensue. Suppose a woman to hold out her house as one of ill fame. Does it take from it the character of a nuisance, that *128 there has been no instance of actual prostitution? Or, on trying it under an indictment, would it be necessary to show a case of prostitution ? The law applies, as we have seen, the presumptio juris et da jure. A man who should erect a pig-stye under his neighbor’s window could hardly excuse himself by showing that he intended to keep it clean and inoffensive, although the thing is useful' in itself. A house in a populous town, divided for poor people to inhabit during the prevalence of an infectious disease, is a nuisance. (1 Roll. Abr. 139, tit. Nusans Common, (F) 3.) The law does not wait for the disease to spread. It exercises a wise forecast, and repels the evil at the threshold. It does the same thing in favor of public morals and public economy. A useless establishment, wasting the time of the owner, tending to fasten his own idle habits on his family, and to draw the men and boys of the neighborhood into a bad moral atmosphere—a place which, in despite of every care, will be attended by profligates, with evil communication, and at best with a waste of time and money, followed by the multiplication of paupers and rogues—has always been considered an obvious nuisance. Surely we have not come to an age when the morality of the law is relaxed beyond what it was in the reign of Charles the Second, the date of Hall’s booth, erected, as he said, by license from the king. This was a very probable account. Charles was known to be the most careless in his moral conduct of any man in his kingdom, and to keep a court which was abandoned to all sorts of licentiousness. The dulce of Buckingham, his principal adviser, was said himself to have been a rope-dancer. It is not very likely that a king whose palace was distinguished for being the largest brothel in Europe, and who is known to have dismissed Lord Clarendon on the joint advice of Buckingham and the Duchess of Cleveland, a prostitute, would hesitate to license any vicious establishment for which such courtiers might invoke his patronage. The rule of the common law becomes more evident, and the precedent referred to more imposing, when thus placed in ■ contrast with the moral waste by which it was surrounded. I must be allowed to protest against the supposition that the same law will, in this age *129 and country, and in such a village as Albion, hold practices to be innocent which were denounced as offences against public-morals and economy in the reign of Charles the Second. I say Charles the Second. I am aware that the bowling-alley was tom down in the previous reign; but it was cited as a precedent in point to that of the rope-dancer’s booth. The more modern precedents leave no room for suspecting relaxation. In the 1 Geo. 3, (1761,) an indictment at common law was sustained, which charged a house to be disorderly, because the defendant, for his gain, lucre and profit, invited evil and ill disposed persons, of ill name and fame, and of dishonest conversation, to congregate in it, where they remained, “fighting of cocks, boxing, playing at cudgels, and misbehaving themselves.” (Rex v. Higginson, 2 Burr. 1232.) Coming to our own country, we find the law, as here administered, denouncing penalties against the remotest approaches to moral infection. The act of 1815 incorporating the town of Franklin, in Tennessee, gave the town power, as in the act before us, to make by-laws for the prevention of nuisances. A by-law was passed inflicting a penalty of five dollars on any person who should exhibit a stud-horse in the town. The defendant having exhibited his horse, the supreme court held the act to be a nuisance, on the principle, as they remarked, which condemned alehouses, gaming-houses, brothels, booths for rope-dancers, mountebanks and the like. (Nolin v. Mayor and Aldermen of Franklin, 4 Yerg. 163.) The case is the stronger, because the exhibition was in itself necessary in the breeding of horses. Yet the offensive character of the employment, and the place where exercised, were held sufficient to characterize the act as criminal per se.
The only argument I have heard urged in excuse for bowling-alleys is, that the exercise of the players is conducive to health. In this respect such alleys have been compared with bathhouses. The answer is, that there are various other kinds of exercise entirely equivalent; and- if not, the means of playing with bowls are easily accessible without those public establishments carried on for hire which the law has denounced as of *130 evil tendency. The playing with cards and dice has been recognized by grave authority as useful in recreating and fitting a person for business. (Bac. Abr. Gaming, (A). ) Yet it would scarcely be pretended that a card or dice-room kept for a reward, under the strongest protestations that it was intended solely for recreation, should be tolerated by the law. The pernicious consequence of allowing men to have a pecuniary interest in promoting that sort of play is too well known.
There is no need, therefore, as the counsel for the plaintiff in error supposes, of the corporation showing that the power they have assumed is derivable from the general clause of the statute authorizing by-laws relative “to any thing &c. that may concern the safety, advantage or good government of said village.” The by-law is not “ contrary to or inconsistent with the laws of this state or of the United States.” It is not, as he supposes, necessary to show actual gambling or actual mischief; and the alley is far from being legitimate in the same sense as the instances he puts of oyster-shops, places of innocent refreshment, recreation or amusement, or for religious exercise. The People v. Sergeant sustains no such view. Or, if it could be carried to the extent contended for, we should be bound to disregard it; at least to prevent its interference with the settled law of nuisance. The application of that law must always be regulated in some measure by the facts of each case, though judges, as we have seen, are bound to notice them judicially, collecting their knowledge from general experience. For one, I should not have thought myself warranted in regarding billiard-rooms as of that venial character which seems to be accorded to them in the case cited. Billiard-tables are denounced by the statute as criminal apendages to taverns, passenger-boats, vessels &c. I do not remember ever having seen a game of billiards played, and am still farther removed from actual knowledge whether the rooms where they are kept have a tendency to promote any kind of moral evil. The information which reached me, however, while upon the circuit, and on which I was in the habit of charging grand-juries, was any thing but favorable to those places. Were the question res nova, I doubt whether I could bring *131 myself to join in the annunciation that a billiard-room kept for lucre, in whatever place, is not a nuisance at the common law. I should certainly hesitate, however, with the case cited before me, and while legislation is so severe upon them when found in certain places, to adjudge that they are within the general principles which I have found applicable to bowling-alleys.
It is said, the constitution gives the legislative power to a senate and assembly, which cannot delegate the right to make laws. The answer is, that the words of the constitution comprehend and imply all the accustomed and acknowledged powers of legislation. Among these is the power to create municipal corporations with the right to pass by-laws for local objects.
I am of opinion that the judgment should be affirmed.
Judgment affirmed.